# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MARVIN MALONE,                              )
                                            )
      Plaintiff,                    )
                                            )    No. 17 C 1953
    v.                                )
                                            )    Judge Sara L. Ellis
NANCY A. BERRYHILL, Deputy                  )
Commissioner of Operations, Social Security )
Administration,                             )
                                            )
      Defendant.                    )

## OPINION AND ORDER

Plaintiff Marvin Malone seeks to overturn the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381a. The Commissioner has filed a motion for summary judgment, asking the Court to uphold the decision. The Court finds that the Administrative Law Judge ("ALJ") did not err in finding that Malone is not disabled and affirms the ALJ's decision.

## BACKGROUND

### I.      Malone's Background

In December 2003, Malone fractured his left femur and tibia in a car accident, requiring surgery. AR 462; 528–552. Shortly thereafter, in March 2004, Malone had surgery on his left knee, which improved his range of motion. AR 523–54. After these surgeries, he underwent physical therapy to further increase his range of motion, strengthen his left leg, and improve his gait. AR 526–27; 559–569, 572–73, 575–78, 592–602. Malone also dislocated his left shoulder in April 2005. AR 676, 681.

In 2008, Malone saw a doctor complaining of seizures. AR 701. He had an EEG, which indicated a mild diffuse slow wave abnormality. AR 702. In August and September 2009, Malone complained to doctors of shoulder pain after having a seizure in July of that year. AR 703. He then began physical therapy for his right shoulder at Schwab Rehabilitation Hospital. AR 704–05, 709–18. He reported to his physical therapist that he helped at a family business, sometimes up to five days a week, where he did some lifting, including of boxes weighing up to forty pounds. AR 703. During one physical therapy session in October 2009, Malone had a staring spell seizure, later reporting he had another seizure at home that evening. AR 706. Malone reported he had not taken his seizure medication at the time. AR 703. In December 2011, Malone presented to Ashland Primary Care ("Ashland"), part of the Access Community Health Network, reporting that he had experienced a seizure the week before and had run out of his seizure medication . AR 487. The doctor instructed Malone not to miss his medicine. AR 487. In April 2012, Malone again reported having a seizure in the past week, at which time the doctor increased the dose of his seizure medication. AR 490.

In September 2012, when he presented to Ashland to have disability paperwork completed, he reported having two seizures in August and one the previous week and that he experienced both convulsive and staring spell seizures. AR 497. The doctor referred Malone to a neurologist. AR 498. Also during this visit, the Ashland doctor recorded a two-centimeter difference in the length of his legs. AR 498. Malone reported a limited range of motion in his shoulders when reaching overhead and behind his back, but he had normal strength levels. AR 498. Malone also complained of pain in his hip and left leg, and the doctor referred him to a podiatrist for these issues. AR 498.

In February 2013, Malone reported his last seizure occurred "a few months ago," and that he was taking his medicine regularly and drinking occasionally. AR 516. In February 2014, Malone visited a different practice, Chicago Family Chicago Lawn, where he related that his seizure medicine was giving him "good results" and that he had had approximately four to five convulsive seizures over the past eight years. AR 603. At this visit, he also reported using hard liquor approximately twice a week. AR 604. In April 2014, Malone returned to Ashland and reported he had a staring spell the prior week. AR 622. In a follow-up visit the following week, however, he acknowledged he had taken less of his seizure medicine than prescribed each day. AR 625–26. In August 2014, Malone saw a neurologist, relating that he first had a seizure in February 2005. AR 688. He acknowledged that the medicine, which he took erratically, generally controlled his seizures but that he still sometimes experienced staring spell seizures where it took him a minute or two to recover his speech. AR 688. In a follow-up appointment with the neurologist in December 2014, Malone reported he had not had any seizures in the interim. AR 695. The neurologist noted that an EEG from September 2014 suggested Malone had an increased risk of seizures. AR 697. In December 2014, a doctor at Ashland advised Malone to decrease his alcohol intake because of elevated liver enzymes. AR 658. In January 2015, Malone acknowledged drinking "way more than 5–6 shots of tequila on most weekends," but he denied daily alcohol use. AR 662. He indicated that he had not had a convulsive seizure in "quite some time," but that once over the past summer, he had a staring spell. AR 662. In June 2015, Malone returned to the neurologist, where he reported having a seizure in May 2015 when under a lot of stress. AR 719.

Dr. Daneen Woodard, one of the doctors Malone had seen at Ashland, completed a physical capacity questionnaire on February 9, 2015. AR 665–69. She indicated Malone's

prognosis for his seizure disorder was good, and that for his left hip pain was fair.  AR 665.  She

represented that his last partial seizure occurred a month ago, with his last convulsive seizure

several years before and stress one of the triggers of seizures.  AR 665–66.  Dr. Woodard noted

that Malone had sharp left hip pain and on and off shoulder pain.  AR 665.  She judged Malone

capable of low stress jobs, with his pain interfering with his ability to pay attention and

concentrate regularly (i.e. during 20-33% of an eight-hour workday).  AR 666.  Dr. Woodard

judged that Malone could walk for one block without rest, sit two hours before needing to get up

and a total of two hours in an eight-hour workday, and stand for forty-five minutes at a time and

less than two hours during an eight-hour workday.  AR 666–67.  She concluded that Malone

would need frequent breaks of between ten and fifteen minutes each.  AR 667.  She also

estimated that Malone would likely miss more than four days a month because of his

impairments.  AR 668.

In his disability application, Malone indicated that he last worked in a full-time capacity

in 2000, assembling and packaging merchandise at a warehouse.  AR 209, 405.  In a function

report completed October 25, 2012, Malone claimed a limited ability to work because he did not

know when he would have a seizure and his hip and legs sometimes slowed him down.  AR 416.

Malone indicated that he usually spent his days watching television or reading, sometimes going

for short walks as well, usually of a block or two before needing to rest.  AR 417, 421.  He

claimed issues with walking, kneeling, and his memory and concentration.  AR 421.  Malone

could iron, do laundry, and vacuum.  AR 418.  But he did not drive because he did not know

when he would have a seizure, AR 419, and his mother helped him take care of his kids when

they came over for this reason as well, AR 417.  Malone also claimed that his medication made

him sleepy.  AR 417.  His prescription records showed that he refilled his seizure medicine

approximately every two months, even though each time he received only a thirty-day supply. AR 456–57.  He had problems reaching overhead because he did not have the entirety of his range of motion back after shoulder surgery.  AR 425.  Malone claimed he could not sit for at least two hours without having to stand or stretch.  AR 426.

Three family members filled out seizure description forms in October 2012.  John Guise, his brother-in-law, stated that Malone suffered more than one seizure a month, with Guise having witnessed about seven or eight of them.  AR 428.  He noted that Malone did not receive advance warning of a seizure and had been injured during his seizures.  AR 428.  Estelle Malone, his mother, stated Malone had one or less seizure per month, and that she had witnessed all of Malone's seizures.  AR 429.  She also reported Malone lost consciousness for about five or ten minutes and when he came to he did not remember what happened.  AR 429.  Tamsey Malone, his sister, noted witnessing seizures that year in July and October, estimating Malone suffered one or less seizure a month.  AR 430.

## II.    Disability Claim and Hearing Testimony

On August 24, 2012, Malone filed an application for SSI, alleging disability beginning on February 1, 2005.  AR 13.  Malone's application was denied initially on December 4, 2012, and on reconsideration on March 18, 2013.  *Id.*  Malone requested a hearing on April 26, 2013.  *Id.* He appeared before an ALJ for a hearing on August 25, 2015.[1]  Counsel represented Malone at the hearing, where Malone and Gary Paul Wilhelm, a vocational expert, testified.  AR 13.

### A.    Malone's Testimony

Malone, born on July 5, 1977, was thirty-eight at the time of the ALJ hearing and lived with his mother.  AR 40.  He testified that he had previously received social security disability

---

[1] Malone also appeared for a hearing before a different ALJ on February 12, 2015.  AR 108–177.  Before that ALJ could issue an opinion, she passed away.  AR 355.  Malone's case was reassigned to a new ALJ, who held another hearing on August 25, 2015, and rendered a decision thereafter.

benefits for a closed period, beginning in 2003.[2]  AR 41.  He stated that in recent years, he had

worked part-time stocking shelves and working the cash register at neighborhood stores, AR 41–

44, as a shoe salesman from 2000 to 2004, AR 45, and in warehouse assembly prior to 2000, AR

45.  Malone testified he had basic computer skills and a high school education.  AR 49–50.

Malone stated that his seizures were the biggest barrier to his returning to work, with

stress contributing to his seizures.  AR 50, 73.  He had two big seizures in May and June 2015,

AR 51, and experienced little, staring spell seizures two or three times a month, AR 54.  When

he had a seizure, Malone said it took him several hours to get back to his normal self.  AR 55.

At the time of the hearing, he was taking his seizure medication as prescribed, but he admitted to

previously taking it inconsistently.  AR 74–75.  Malone acknowledged drinking approximately

three or four glasses of alcohol once a week.  AR 61–62.  He claimed he had limited range of

motion because he dislocated his shoulder during a seizure.  AR 56.  This, he said, kept him from

lifting heavy objects and reaching overhead.  AR 56–57.  His hip, though, bothered him the

most, AR 60, with Malone claiming he could barely walk about half of the days in a month and

often walked with a makeshift cane, AR 61, 67–68.  Malone claimed he could typically work for

between forty-five minutes to an hour and a half before needing to take a break.  AR 66.  He

believed he could sit for between an hour and a half and two before needing a break.  AR 72.

## B.    Vocational Expert Testimony

Gary Wilhelm, a vocational expert, used Malone's work as a shoe salesman as a baseline,

which qualified as semi-skilled work with a light physical demand.  AR 76.  Wilhelm opined that

a person with Malone's limitations could not perform this work because it required overhead

lifting.  AR 77.  But Wilhelm testified that Malone could perform work as a checker cashier at a

---

[2] The record is not entirely clear with respect to Malone's prior receipt of disability benefits.  His counsel represented in a pre-hearing memorandum to the ALJ that Malone had previously applied for SSI on July 7, 2004, received a denial on November 4, 2004, and did not appeal.  AR 462.

store, AR 77, a school bus monitor, AR 78, and an usher, AR 78.  Looking only at sedentary work with Malone's limitations, Wilhelm opined that Malone could work in inside sales work or telemarketing, AR 78, or as an appointment clerk or maintenance scheduler, AR 79.  Wilhelm noted that Malone's seizures would affect his ability to perform any of this work on a case-by-case or employer-by-employer basis, precluding him from competitive work.  AR 80.

## III.    The ALJ's Decision

On September 1, 2015, the ALJ issued a written decision denying Malone SSI benefits. AR 10–23.  Following the five-step analysis used by the Social Security Administration to evaluate disability, the ALJ found at step one that Malone had not engaged in substantial gainful activity since August 24, 2012, the date he applied for SSI.  AR 15.  The ALJ then proceeded to step two, concluding that Malone had the following severe impairments: a seizure disorder, a history of bilateral shoulder dislocation, and a hip injury and surgery.  AR 15.  At step three, the ALJ found that the severity of Malone's impairments did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart 4, Appendix 1.  AR 15–16.  The ALJ considered Malone's seizures under Listing 11.02 and 11.03, for convulsive and non-convulsive epilepsy respectively, and found Malone did not meet their requirements, noting that when Malone took his medication, he did not experience convulsive seizures more than once a month and non-convulsive seizures more than once a week.  AR 16.

After reviewing the record, the ALJ concluded that Malone had the residual functional capacity ("RFC") to perform light work, with the following restrictions: lifting and carrying ten pounds frequently and twenty pounds occasionally; standing and walking for approximately six hours of an eight-hour workday, and sitting for about six hours of an eight-hour workday, with normal breaks; occasional overhead reaching bilaterally; no overhead lifting or climbing of

ladders, ropes, or scaffolds; and no exposure to hazards, such as dangerous machinery or unprotected heights. AR 16. In reaching this conclusion, the ALJ did not find Malone's statements about the intensity, persistence, and limiting effects of his symptoms entirely credible. AR 17. The ALJ reviewed all of Malone's medical records in reaching his RFC determination. AR 18–21. He noted that the record did not establish current treatment or even current, persistent symptoms related to Malone's left leg and bilateral shoulder injuries, relying on the remoteness of the injuries and the fact that Malone only complained of related pain and demonstrated he had physical limitations as a result in one examination between December 2011 and June 2015. *Id.* As for Malone's seizures, the ALJ found that Malone's seizures coincided with times when he did not take his medicine as prescribed, noting also that Malone continued to drink alcohol even though his doctors cautioned against this. AR 18. The ALJ also found the evidence reflected that Malone's seizures had decreased over time. The ALJ took into consideration the fact that Malone walked into the hearing without difficulty and appeared to sit comfortably during it, in addition to the fact that Malone had held some part-time jobs. *Id.* While making clear Malone's actions at the hearing were not dispositive, such evidence considered in combination with the remaining record suggested to the ALJ that Malone's limitations were somewhat exaggerated. *Id.* The ALJ gave slight, not significant, weight to Dr. Woodard's opinion, noting that even though she was a treating source, Malone's medical records and the evidence did not support Dr. Woodard's evaluation of the extent of Malone's impairment. AR 21. The ALJ concluded that instead of providing an objective assessment, Dr. Woodard's opinion "appears to be a sympathetic assessment intended to convince the [ALJ] to award the claimant disability benefits." AR 21. The ALJ also did not give significant weight to Malone's family members' reports of his seizures, noting inconsistencies among them and with

the record, including Malone's own reports. ALJ 21. The ALJ instead gave greater weight to the state agency consultants' opinions, though he gave Malone's statements the benefit of the doubt and concluded that Malone was more limited than the consultants opined. AR 22.

Based on these findings and the RFC, the ALJ found at step four that Malone could not perform his past work, which included working as a retail shoe sales person, because the overhead lifting restrictions would keep him from such a job. AR 22. Then, at step five, the ALJ concluded that Malone was not disabled because he could perform a number of jobs available in the national economy, specifically as a cashier, school bus monitor, or usher. AR 22–23.

The Appeals Council denied review on January 11, 2017, AR 1–6, making the ALJ's decision the final decision of the Commissioner. Malone now seeks judicial review of the ALJ's decision.

## LEGAL STANDARD

### I. Standard of Review

In reviewing the denial of disability benefits, the Court "will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence." *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (citation omitted) (internal quotation marks omitted). Although the Court reviews the entire record, it does not displace the ALJ's judgment by reweighing facts or making independent credibility determinations. *Beardsley v. Colvin*, 758 F.3d 834, 836–37 (7th Cir. 2014). But reversal and remand may be required if the ALJ committed an error of law or the decision is

based on serious factual mistakes or omissions. *Id.* at 837. The Court also looks to "whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). "[H]e need not provide a complete written evaluation of every piece of testimony and evidence," *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)), but "[i]f a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required," *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## II.     Disability Standard

To qualify for DIB or SSI, a claimant must show that she is disabled, i.e. that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Weatherbee v. Astrue*, 649 F.3d 565, 568 (7th Cir. 2011). To determine whether a claimant is disabled, the Social Security Administration uses a five-step sequential analysis. 20 C.F.R. § 404.1520; *Kastner*, 697 F.3d at 646. At step one, the ALJ determines whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). At step two, the ALJ considers whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement. 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant's impairment(s) meet or equal a listed impairment in the Social Security regulations, precluding substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the

claimant's impairment(s) meet or medically equal a listing, the individual is considered disabled; if a listing is not met, the analysis continues to step four. 20 C.F.R. § 404.1520(a)(4)(iii). At step four, the ALJ assesses the claimant's RFC and ability to engage in past work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can engage in past relevant work, he is not disabled. *Id.* If he cannot, the ALJ proceeds to step five, in which the ALJ determines whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v). An individual is not disabled if he can engage in other work. *Id.* The claimant bears the burden of proof on steps one through four, while the burden shifts to the government at the fifth step. *Weatherbee*, 649 F.3d at 569.

## ANALYSIS

In seeking to overturn the ALJ's decision, Malone argues that (1) the ALJ erred in evaluating the opinion of Malone's treating physician, Dr. Woodard; (2) the ALJ did not properly analyze Malone's family members' reports concerning his seizures; (3) the ALJ improperly discredited Malone's testimony concerning his symptoms; and (4) the evidence does not support the ALJ's RFC assessment. The Court addresses each of these contentions in turn.

## I.     Evaluation of the Treating Physician's Opinion

First, Malone claims that the ALJ failed to accord proper weight to the opinion of Dr. Woodard, Malone's treating physician, and did not provide sufficient reasons for rejecting that opinion concerning Malone's functioning. The ALJ must give a treating physician's opinion "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 416.927(c)(2).[3] The ALJ must support his conclusion about the weight given to a

---

[3] The regulations concerning the evaluation of opinion evidence were amended for claims filed after March 27, 2017. But the parties agree that, because Malone filed his claim before March 27, 2017, the

treating physician's opinion with "good reasons," *id.*, and if he does not afford the opinion controlling weight, "the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

In this case, Dr. Woodard opined that Malone's symptoms would interfere regularly with his ability to pay attention and concentrate on simple work tasks and that he needed a low-stress job to prevent seizures. AR 666. She further stated that Malone would miss more than four days of work because of his impairments. The ALJ gave only slight weight to Dr. Woodard's opinion, determining that the record, including Dr. Woodard's own treatment notes, did not support Dr. Woodard's evaluation of the extent of Malone's impairment. AR 21. Instead, the ALJ considered her opinion to be "a sympathetic assessment intended to convince the [ALJ] to award [Malone] disability benefits, not an objective evaluation of [Malone's] capabilities." *Id.* Specifically, the ALJ noted that Malone's treatment notes only showed one complaint of hip or bilateral shoulder pain, made during a September 2012 appointment for filling out disability paperwork. AR 21. And the ALJ did not find Malone's physical examinations corroborated Dr. Woodard's opinion because they typically did not include musculoskeletal evaluations or otherwise fell within normal limits. *Id.* Finally, the ALJ compared Dr. Woodard's opinion against the neurologist's examinations, which did not suggest any pain in or disuse of Malone's arms or leg. *Id.* Having reviewed the record, the Court concludes that the ALJ did not commit reversible error in giving Dr. Woodard's opinion slight weight where her opinion did not have

---

treating physician rule applies to his claim. *See Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018) (noting that the treating physician rule applies to claims filed before March 27, 2017).

support in the record. *See* 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

But Malone has several specific complaints about the ALJ's treatment of Dr. Woodard's opinion. First, he argues that the ALJ did not discuss Dr. Woodard's opinions related to his seizures. The Court acknowledges that the ALJ did not specifically discuss Malone's seizures in his evaluation of the weight to accord to Dr. Woodard's opinion. *See* AR 21. But the ALJ stated that the record evidence did not support "the extreme degree of impairment [Dr. Woodard] described," AR 21, which, with respect to any restrictions she found based on his seizures, must be considered in light of the ALJ's extensive discussion of how the alleged severity of Malone's seizures did not match the record evidence. *See* AR 18–21. The ALJ did not need to repeat this analysis in discussing the weight he attached to Dr. Woodard's opinion. *See Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015) (finding that an ALJ need not repeat a discussion that "appears elsewhere in the decision" where doing so "would be redundant"); *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1985) ("[W]e examine the administrative law judge's opinion as a whole to ascertain whether he considered all of the relevant evidence, made the required determinations, and gave supporting reasons for his decisions.").

Next, Malone complains that the ALJ failed to consider that Dr. Woodard belonged to a practice that treated Malone over the course of many years, with Dr. Woodard having access to the entirety of his medical records from that practice. Although the ALJ noted that Dr. Woodard qualified as a treating source, he did not explicitly discuss the length, nature, and extent of her treatment relationship or the frequency of examination. Consequently, an argument could be made that he failed to sufficiently account for the factors prescribed for evaluating the weight to be given to a physician's opinion. *See, e.g.*, *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir.

2010) (remanding case where ALJ did not explain the checklist of factors in determining the weight to be given to a treating physician's opinion). But here, the Court finds the ALJ's failure to explicitly discuss these other factors harmless, where the ALJ discussed Ashland's treatment of Malone in detail, including in recounting the medical evidence in the record that undermined Dr. Woodard's opinion. *See Schrieber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013) ("[W]hile the ALJ did not explicitly weigh each factor in discussing Dr. Belford's opinion, his decision makes clear that he was aware of and considered many of the factors, including Dr. Belford's treatment relationship with Schrieber, the consistency of her opinion with the record as a whole, and the supportability of her opinion."); *Henke v. Astrue*, 498 F. App'x 636, 640 n.3 (7th Cir. 2012) ("The ALJ did not explicitly weigh every factor while discussing her decision to reject Dr. Preciado's reports, but she did note the lack of medical evidence supporting Dr. Preciado's opinion, and its inconsistency with the rest of the record. This is enough." (citations omitted)).

Malone also argues that the ALJ provided only speculation in concluding that Dr. Woodard offered her opinion out of sympathy. But the ALJ properly could consider "the biases that a treating physician may bring to the disability evaluation." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001); *see also Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability. The regular physician also may lack an appreciation of how one case compares with other related cases."). Here, Dr. Woodard did not provide details or explanations for several of her opinions, instead only checking certain boxes on a pre-printed form.[4] *See Dixon*, 270 F.3d at 1177 (noting that in rejecting treating physician's

---

[4] The ALJ does not appear to have discounted Dr. Woodard's opinion because it was provided in response to solicitation from Malone's counsel. *See Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("[T]he

opinion, ALJ took into account the fact that the physician did not elaborate on the bases for her opinions provided on a pre-typed form).  Moreover, any speculation about Dr. Woodard's intentions is irrelevant in this case because the ALJ's evaluation of Dr. Woodard's opinion has a basis in substantial record evidence.

Finally, Malone argues that instead of discounting the only treating source opinion, the ALJ should have questioned Dr. Woodard further regarding the inconsistencies between her RFC assessment and the medical record.  But because substantial evidence existed in the record to support the ALJ's decision, the ALJ did not need to do so.  *See Skinner v. Astrue*, 478 F.3d 836, 843–44 (7th Cir. 2007) (ALJ need not obtain further information from doctor where the record includes sufficient information to render a decision); *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) ("This court generally upholds the reasoned judgment of the Commissioner on how much evidence to gather, even when the claimant lacks representation.").  Because the record did not support the extent of the limitations Dr. Woodard indicated, the ALJ could give only slight weight to Dr. Woodard's opinion without recontacting her for additional evidence.  *See Simila*, 573 F.3d at 516–17 ("An ALJ is entitled to evaluate the evidence and explanations that support a medical source's findings.  And she need not recontact the source every time she undertakes such an evaluation, but only if . . . 'the medical support is not *readily discernable*.'" (quoting *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004)).  Therefore, the Court finds that the ALJ did not err in assigning Dr. Woodard's opinion only slight weight.

---

fact that relevant evidence has been solicited by the claimant or her representative is not a sufficient justification to belittle or ignore that evidence.").  Instead, it appears that the ALJ found Dr. Woodard's answers to the form contrary to the record without sufficient information to explain the inconsistencies. *See id.* at 713 (noting that the ALJ must determine whether the treating source's opinion is well supported and consistent with the evidence in the record to ensure the doctor is not "bend[ing] over backwards to assist a patient in obtaining benefits").

## II.     Family Members' Seizure Reports

Next, Malone argues that the ALJ incorrectly evaluated the three seizure reports his family members submitted.  The ALJ did not give these reports "significant weight," noting their inconsistencies with respect to the frequency of Malone's seizures.  AR 21.  Further, the ALJ stated that, as non-medical professionals, Malone's family members had not established they had the capability to evaluate the severity of Malone's symptoms or to build a causal connection between those symptoms and a "medically determinable impairment."  *Id.*

Malone first argues that any inconsistencies in his family members' reports were trivial. His sister and mother indicated Malone experienced one or less seizure per month and his brother-in-law stated Malone experienced more than one seizure per month.  AR 428–30.  But they also noted the number of seizures they had witnessed, with his sister and mother indicating they had most recently witnessed seizures in July and October 2012 and his mother stating she had witnessed all of his seizures.  *Id.*  Using his mother's report, Malone had a seizure once every three months, while using his brother-in-law's statements, Malone purportedly suffered at least six seizures over that same period.  *Id.*  And the evidence in the record also suggested that these family members' reports did not necessarily correlate with the number of seizures Malone himself reported, both to doctors and to the ALJ.  While Malone argues that the ALJ should have inquired further of him about the number of seizures he suffered, this argument does not hold up: Malone testified at the hearing that he had suffered only two seizures between January and August 2015.  AR 51.  The Court therefore does not find that the ALJ overly relied on trivial inconsistencies in the record about the frequency and intensity of Malone's seizures in deciding not to accord significant weight to Malone's family members' reports.

Malone also argues that the ALJ should have given more weight to their evaluation of

Malone's symptoms when he had a seizure. Malone relies on Listing 11.00(B)(1), for

neurological disorders, which provides that the ALJ should consider "non-medical evidence such

as statements [the claimant] or others made about [the claimant's] impairments" in documenting

the claimant's neurological disorder. 10 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 11.00(B)(1).

But the ALJ found at step three that Malone's epilepsy did not meet or medically equal the

requirements of the specific epilepsy listings, AR 16, a finding that Malone does not challenge.

Instead, he challenges the ALJ's determination at step four not to give the seizure reports

significant weight in determining Malone's RFC. Although the ALJ may not have accorded

these reports the weight Malone believes they deserved, the ALJ did consider them in making his

RFC determination, which is all that Listing 11.00(B)(1) requires. *See Skinner*, 478 F.3d at 841

("When reviewing for substantial evidence, we do not displace the ALJ's judgment by

reconsidering facts or evidence or making credibility determinations.").

## III.    Credibility Assessment

Malone argues that the ALJ did not properly evaluate his credibility in conducting the

symptom evaluation. The ALJ must, pursuant to Social Security Ruling 96-7p, 1996 WL

374186 (July 2, 1996), engage in a two-part analysis for symptom evaluation.[5] First, the ALJ

determines whether the claimant has an "underlying medically determinable physical or mental

<hr>

[5] The Social Security Administration rescinded SSR 96-7p and issued SSR 16-3p on March 16, 2016, eliminating the use of the term "credibility" from the symptom evaluation process. SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016). "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). Although Malone claims that SSR 16-3p should apply, SSR 96-7p continues to govern his case at this point. SSR 16-3p applies only to ALJ determinations made on or after March 28, 2016, and the ALJ issued his decision in this case on September 1, 2015. *See* Notice of Social Security Ruling (SSR), 82 F.R. 49462-03, 2017 WL 4790249, at 49468 n.27 (Oct. 25, 2017).

impairment(s) that could reasonably be expected to produce the individual's pain," and, if so, the ALJ must "evaluate the intensity, persistence, and limiting effects of the individual's symptoms." SSR 96-7p, 1996 WL 374186, at *2. In doing so, he must assess the credibility of a claimant's statements about pain and other symptoms. *Id.* When these statements are not substantiated by objective medical evidence, the ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *2, 4. The ALJ may not disregard "allegations concerning the intensity and persistence of pain or other symptoms . . . solely because they are not substantiated by objective medical evidence." *Id.* at *6. But "[a] report of negative findings from the application of medically acceptable clinical and laboratory diagnostic techniques is one of the many factors that appropriately are to be considered in the overall assessment of credibility." *Id.* The ALJ must justify his credibility finding with "specific reasons supported by the record," *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013), and build "an 'accurate and logical bridge' between the evidence and the conclusion." *Craft*, 539 F.3d at 673; *see also Shideler*, 688 F.3d at 311; *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); SSR 96-7p, 1996 WL 374186, at *4.

A credibility finding is entitled to substantial deference from a reviewing court and will be overturned only if "patently wrong," *Pepper*, 712 F.3d at 367 (quoting *Craft*, 539 F.3d at 678), or if the trier of fact "grounds his credibility finding in an observation or argument that is unreasonable or unsupported," *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). A decision is "patently wrong" "when the ALJ's determination lacks any explanation or support." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Malone generally argues that the ALJ failed to provide any explanation for finding Malone's statements concerning his symptoms "not entirely credible." AR 17; *see Martinez v.*

*Astrue*, 630 F.3d 693, 696 (7th Cir. 2011) (criticizing ALJ for his "perfunctory" credibility analysis). Malone complains that the ALJ did not specify which allegations he found consistent with the record and which he did not. But "an ALJ's credibility findings need not specify which statements were not credible." *Shideler*, 688 F.3d at 312. In contrast to *Martinez*, the ALJ here examined a considerable amount of medical and other evidence in determining Malone's credibility, comparing Malone's testimony and other statements to his treatment history. AR 17–22. This discussion provides adequate support for the ALJ's credibility finding, and so Malone's complaint that the ALJ did not specifically identify which statements were not credible "does not demonstrate that the ALJ's credibility finding is not supported by substantial evidence." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003).

More specifically, Malone complains that the ALJ did not explain whether or how much Malone's alleged alcohol use undermined his symptoms. But the ALJ's decision indicates that the ALJ discounted the severity of Malone's reported seizure symptoms based on Malone's continued alcohol use despite being cautioned by his doctors to avoid excessive drinking. AR 18, 20. Malone's treatment notes, which indicate that his doctors drew a connection between his alcohol consumption and the severity of his seizures and the prescribed treatment, support the ALJ's consideration of his alcohol use and its effect on the frequency of Malone's symptoms. *See* SSR 96-7p, 1996 WL 374186, at *3 (noting that in addition to objective medical evidence, the ALJ can consider other factors in assessing the credibility of the claimant's statements, including aggravating factors, the frequency of pain and symptoms, and the effectiveness of medication). The ALJ's discussion of Malone's alcohol use and doctors' advice against such use was sufficiently specific to allow this Court to assess the ALJ's reasoning in finding this factor undermined Malone's reported symptoms.

Malone also complains that the ALJ based his credibility assessment on his observations of Malone at the hearing, where the ALJ stated that Malone could "walk into the hearing room without difficulty, and appeared to sit comfortably during the hearing." AR 18. If the ALJ had based his entire opinion on such a "sit and squirm" test, the Court would agree the ALJ rendered his decision on an improper basis. *See Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) ("Many courts have condemned the 'sit and squirm' test, and we are uncomfortable with it as well."). But the ALJ specifically qualified his observations, noting that they were "not dispositive" and that he factored them into his consideration of Malone's claimed limitations along with "the other evidence in the record, including [Malone's] subjective complaints to his treating sources." AR 18. Malone argues further that the ALJ should not have taken into account his ability to sit or walk because his case "is based primarily on seizures." Doc. 18 at 17. But Malone also complained of hip and leg pain, testifying that on some days he "barely can walk." AR 60. The ALJ thus validly took Malone's ability to sit and walk into account in crafting the RFC. And because the ALJ's observations of Malone during the hearing were only one factor in the ALJ's credibility determination, the Court does not find it requires remand. *See Powers*, 207 F.3d at 436 (further noting that even courts that oppose the "sit and squirm" test "endorse the validity of a hearing officer's observations of the claimant" and that it could not find the ALJ's credibility determination "patently wrong" where the ALJ also considered other factors).

Finally, Malone claims that the ALJ improperly relied on Malone's part-time work after his alleged date of disability to discount his subjective complaints. An ALJ may consider a claimant's part-time work as a factor in the credibility analysis. *See* 20 C.F.R. § 416.929(c)(3)(i) (noting that a claimant's daily activities may be considered in evaluating credibility); *Berger v.*

*Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("Although the diminished number of hours per week indicated that Berger was not at his best, the fact that he could perform some work cuts against his claim that he was totally disabled."). Although Malone claims that the ALJ did not consider that part-time work does not translate into full-time work, the ALJ specifically noted that Malone's ability to work part-time was only one factor among many in reaching the RFC determination. AR 18 (noting that the evidence of Malone's part-time jobs "does not prove the claimant is able to work"). Therefore, the Court does not find that the ALJ erred in his evaluation of Malone's symptoms.

## IV. Support for RFC Finding

Finally, Malone argues that the ALJ did not sufficiently support his RFC finding. An ALJ must explain how he reaches his conclusion about the RFC of a claimant and support that conclusion with evidence from the record. *See, e.g.*, SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence[.]"); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) ("The ALJ needed to explain how she reached her conclusions about Scott's physical capabilities[.]"); *Eakin v. Astrue*, 432 F. App'x 607, 611 (7th Cir. 2011) ("The RFC determination should include a discussion describing how the evidence, both objective and subjective, supports the ultimate conclusion.").

Here, the ALJ adequately explained and supported his RFC determination. Initially, the Court does not find merit in Malone's argument that the ALJ did not properly evaluate the impact of his seizures. The ALJ reviewed both the medical and nonmedical evidence presented to him and found that the evidence, including his seizure disorder, limited Malone to light work. The ALJ also added a specific restriction in light of Malone's seizures, finding that Malone

"should avoid all exposure to hazards, such as dangerous machinery or unprotected heights," and that his seizures, in addition to other impairments "would prevent him from climbing ladders, ropers, or scaffolds." AR 21.

Malone also makes several arguments in which he essentially asks the Court to reweigh the ALJ's credibility assessment. But, as discussed above, the Court will only overturn the ALJ's credibility assessment if "patently wrong," *Pepper*, 712 F.3d at 367 (quoting *Craft*, 539 F.3d at 678), or if the trier of fact "grounds his credibility finding in an observation or argument that is unreasonable or unsupported," *Sims*, 442 F.3d at 538. Malone claims the ALJ did not sufficiently explain why he did not credit Malone's testimony or Dr. Woodard's opinion regarding his seizures, but the ALJ explained how the other evidence in the record did not substantiate the severity of Malone's claimed seizure disorder, giving more weight to the evaluations of the state agency consultants and neurologist on the issue. AR 21–22. Malone also argues that the ALJ did not explain how Malone's course of treatment and compliance with treatment affected specific functional limitations. But the ALJ discussed how Malone's compliance or lack thereof with his seizure medicine affected the frequency and severity of his seizures, noting that when Malone regularly took his medicine, he reported his seizures were well-controlled with few significant side effects. AR 18. The ALJ took this into account in making his credibility finding, as allowed by the regulations. *See* 20 U.S.C. § 416.929(c) (one of the relevant factors to a claimant's symptoms is "[t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [his] pain or other symptoms").

Finally, Malone contends that the ALJ created an evidentiary deficit by giving only partial weight to the medical opinions. The ALJ gave Dr. Woodard's opinion slight weight and

the state agency consultants' opinions partial weight. This, however, does not mean that the ALJ did not rely on any medical evidence to come to his RFC finding. The ALJ supported his determination with substantial evidence, properly weighing the medical opinions and considering the entire record, including Malone's treatment notes and other medical records and his own testimony, in reaching the RFC determination. *See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) ("[A]n ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians."). And while Malone argues that the ALJ added limitations not assessed by the state agency consultants, these limitations were to Malone's benefit and based on his own evaluation of his restrictions. *See* SSR 96-7p, 1996 WL 374186, at *4 (ALJ "may . . . find an individual's statements, such as statements about the extent of functional limitations or restrictions due to pain or other symptoms, to be credible *to a certain degree*" (emphasis added)); *Cabrera v. Astrue*, No. 10 C 4715, 2011 WL 1526734, at *12 (N.D. Ill. Apr. 20, 2011) ("Plaintiff is correct that this is more restrictive than the state agency consultants' findings of no manipulative limitations whatsoever, but the ALJ fairly credited Plaintiff's testimony in that regard and modified the RFC assessment accordingly."). Nor did the ALJ need to further develop the evidentiary record here; the ALJ did not completely reject every medical opinion so as to create an evidentiary deficit and the Court "generally respect[s] the [ALJ's] reasoned judgment" on how much evidence must be gathered. *Smith v. Apfel*, 231 F.3d 433, 443 (7th Cir. 2000) (alterations in original) (quoting *Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994)). This is further underscored by the fact that Malone's counsel at the hearing did not suggest that the ALJ needed additional evidence, such as an expert, to decide the claim. *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 679 (7th Cir. 2010) (where a claimant is represented by

counsel, an ALJ is "free to assume that [she] has presented her strongest case for benefits," and counsel's failure to request additional medical opinion evidence suggests that it "would not help" the claimant). Because the ALJ appropriately weighed the physicians' opinions in developing the RFC, giving some weight to Dr. Woodard's and the state agency consultants' opinions, the Court cannot find that the ALJ improperly substituted his own lay assessment so as to require remand. *See McReynolds v. Berryhill*, --- F. Supp. ----, 2018 WL 5574174, at *7 (N.D. Ill. Oct. 30, 2018) (finding that remand was not required because the ALJ considered the physicians' opinions, resolving conflicts among them, and incorporated additional limitations to address some of the claimant's subjective symptoms).

## CONCLUSION

For the foregoing reasons, the Court affirms the ALJ's decision. The Court grants the Commissioner's motion for summary judgment [28] and enters judgment in favor of the Commissioner and against Malone.

Dated: December 12, 2018

_____
SARA L. ELLIS
United States District Judge